Mr. Simmons Thank you, Your Honor. Good morning. May it I represent the appellant, Mr. Anthony Hamilton. I'd like to reserve two minutes for rebuttal. Yes, you may have it. Thank you, Your Honor. This case also raises a very important issue, as the first case did, of when can the police force entry into a private residence bearing only an arrest warrant. Here, the police were in search of Tommy Smith, who had a default warrant for driving an unregistered vehicle, failing to drive with a suspended license. Some 20 or more local, state, and federal law enforcement descended on 16 Harrow Street, believing that Mr. Smith might be present. The police belief in this case was based on some very scant information about Mr. Smith's whereabouts. And that scant information was completely devoid, or almost completely devoid, of any type of temporal markers that would contribute to a belief that Mr. Smith was presently residing at 16 Harrow Street and would be present on that day. And it is our position that the government's view in this case falls on the fact that there are none of these temporal markers. This court and other courts that have addressed this have required some sort of currency with regard to the information possessed by the police and the connection with the subject residence to be entered. What you have here is simply public database information that has no time stamp on it, so to speak, with regard to when Mr. Smith may or may not have used 16 Harrow Street as his address. You have the fact that the arrest warrant, which was issued for a default in his appearance, dates back to August 20, 2010, which is some six months before the entry onto 16 Harrow Street. And then you have an accident report, which is undated. So none of this information tells you when Tommy Smith actually lived at this location. And in fact, when the police entered over the objection of the tenants of the apartment, who told him that Mr. Smith did not live there, he was in fact not present on that day. If you look at the cases that this court has decided and also relied on, such as Graham, Muera, and then this court's reliance on Eighth Circuit cases such as Rees and Clayton, every single one of those had some potent evidence of residence and recency. For example, an informant's tip indicating that the person was living there at that time. Or in Graham, immediately before entering the premises, the police ask the downstairs neighbor, is Mr. Graham upstairs? And the neighbor says yes. Counsel, the record suggests that there were multiple public and court sources that suggested that Mr. Smith lived there at some point. At some point, agreed. At some point. And with the multiplicity of sources suggesting that, your argument is that six months is insufficient proximity. Well, that is the only date we have, right, as to all of this discrete pieces of information. I think there's five pieces of information that the government relies on. The only one with a temporal marker to it is the arrest warrant, and that dates back six months. And yes, my position would be that that six month period is not sufficient to warrant a reasonable belief that Mr. Smith resided at that location on February 6th, February 11th, the date of the entry by the police. I guess what my question is, is that because there were so many sources suggesting that he lived there, was it unreasonable for them to assume, given the multiple sources, regardless of the one date stamp that he had an ongoing residence? I would say yes, and I think I would take some issue with the concept that there were so many different issues. They all come from basically a public database search, correct? Right, including a credit bureau search, right? Well, I don't know that there was a credit bureau search done. There was a public database search which showed that he had filed an accident report there at some point in time. There were FIO's, Field Investigation Observation Reports, that showed that that address was used at some point in time. But again, there's no, I mean, to take one step back, there are no identifiers on any of that information, at least in this record. There's no identifiers indicating that that Tommy Smith was in fact the same Tommy Smith who was the subject of the default warrant. And I guess the other thing I would add to your Honor's comments is, I do think to some extent here the poll camera distinguishes this case in some regard and diminishes some of the viability of that information that the police relied on. The fact that they posted a poll camera outside of the residence for roughly 30 days before the entry, and there's no observation of Mr. Smith either coming or going from that residence, subtracts from whatever information the police did have, and in some respects goes to the issue of staleness of that information. So I do think when you combine everything here with regard to the fact that there are no temporal markers, there's no attempt by the police to corroborate that as his residence. For example, in WERA this court said a simple phone call would have determined whether or not, or potentially could have determined whether or not the subject of the arrest warrant was present at that location. That is your operative assumption, I think. Even if the police had a reasonable basis to go to the house that morning, once they were told that Mr. Smith was not there, they had to not venture any further? Whether it's a phone call or in person doesn't much matter. But you seem to be interposing a new test. I don't believe, first of all I do agree with you Judge Lynch with regard to the fact that once Amina Smith comes to the door and says he's not here, they should take pause. In addition when they then- No, not take pause, they should go away. Agreed. I don't believe I was asking for a new standard here in terms of temporal markers. I think that's just what I glean at least from the cases that this court has decided and the other circuits' cases that this court has relied on. I believe there is some notion of recency in those cases and that's where I pull that from. I don't think that's a new test or a new criteria. I think that's what this court has said starts to get you to the level of reasonable belief, not just to residents but also to presence. Okay. That answers your Honor's question. How recent do you think the report about, is it the accident report is where he self-reports the address? Somebody named Tommy Smith self-reports that address on the accident report. There is nothing in the record. So if Tommy Smith reports that this Harrow Street address is his residence, whoever this Tommy Smith is, how recent do you think that report would have to have been made in order for it to have been reasonable for the government to treat it as his residence? I think there has to be some connection to the residence within, I don't think there should be a time marker put on it, but you know. Well, that's I guess going back to that 30 days. May I finish? Yeah. 30 or 60 days. That's what you see in a lot of the cases is some more recency confirmation of that place of residence. And I'll reserve my time. Thank you. Good morning. May it please the Court, Mark Quinlivan on behalf of the United States. I can begin by responding to my friend's argument that there was no recency to the information that the officers had. Because the evidence that Trooper O'Neill began with was a postal search for 16 Harrow Street. And he received information that Tommy Smith received mail at that address. That, i.e., up to the point in time in which he requested that information, according to the United States Postal Service, Tommy Smith was receiving mail at that address. That then led him to pull the arrest, to see if Mr. Smith had any outstanding warrants. He obtained the arrest warrant, which was issued on January 11th, for an incident that occurred on August 20th, in which Mr. Smith listed 16 Harrow Street, Apartment 2, as his address. But it's important to point out that that information was then supplemented. Trooper O'Neill, on February 15th, requested the assistance of the state police and the Boston Police Department Fugitive Task Force. And they did their own due diligence. So, Officer Ridge conducted, he first looked at Boston Police Department files, found incident reports and field interrogation reports that linked Tommy Smith to 16 Harrow Street. He then did the National Insurance Crime Bureau search and found that Mr. Smith had reported an accident and given his name at that address. And Judge Barron, there was a CP Clear credit bureau search done. And he determined that Tommy Smith and four other individuals listed 16 Harrow Street as their address. And then on top of that, both Trooper O'Neill and Officer Ridge had determined that at least Carolyn Smith, who was listed as Mr. Smith's mother in the accident report, that she and a man had a car registered to that address. So, the cumulative nature of this information and the consistency of that information gave the officers reason to believe that Mr. Smith would be present, well, that he resided. And they executed the arrest warrant at 6 a.m. in the morning. And this court and others have said that that is a time when somebody would reasonably be present at a location where they resided. So, in those circumstances, the district court correctly found that the officer satisfied both prongs of the patent analysis. Am I right that, save for the person at the door when they show up at the house, there's no contrary indication as to residence? In other words, there's... There's nothing in the record to... Other than that. Your brother says, to the contrary, the fact that you have a poll camera looking at the place for 30 days and it never picks up Mr. Smith as coming, that that's negative evidence against you. I don't think that the record bears that out, Judge Lynch, and for several reasons. First off, the district court saw two pictures or sort of stills from that poll camera, which we provided to the court. And I think Trooper O'Neill's testimony at the suppression hearing is entirely consistent with those pictures. When asked, you never saw him at that location. He responded, you've seen those pictures. They're not that good. I don't know if he was there or not. He was then separately asked on one occasion when they were conducting surveillance and they saw a car that had been linked to that address and an individual get out and walk towards 16 Harrow Street. He was asked, were you able to identify that person? The answer, no. Didn't know if it was Mr. Hamilton. Didn't know if it was Mr. Smith. Could not identify him at all. Then why does the government use poll cameras if it can't tell anything from what is recorded? Well, Your Honor, I think the hope was in this case that perhaps it would provide that information. He explained that they were not able to do surveillance because this was a very narrow street and as he said, any kind of surveillance would stick out. So they did put up a poll camera. You know, the hope would be that that might give a usable picture. But I would point out... As a taxpayer, I wondered the same thing that Judge Lynch just asked, by the way. But wouldn't the poll camera have been able to tell you if there were men going in and out? I think, Judge Thompson, I think the answer... Ideally, I would point out the only evidence that the district court saw and heard with respect to that poll camera was the two images that were in front of it. And at least to my eye, all I see is a figure walking towards that residence. I can't make out if it's a man, a woman, height, anything. But what I'm asking is over a 30-day period, is it reasonable to assume if there are two stills of a person walking in and out, that that would constitute a residence? There was only one male figure that goes in once? Well, Judge Thompson, unfortunately, the record just has not developed on that. There were very few questions asked at the suppression hearing about the poll camera and what they saw. And I would point out as well, we're talking about January and February. When the day is the shortest, when it's particularly cold, when people typically are wearing coats and hats. And as you can see from the pictures, this was not a head-on, a poll camera head-on to the residence. It was from the side of the street. So when I think you take all of that into consideration, yes, I think the goal of the poll camera was perhaps they could get a usable identity. But I think the record bears out the idea and Trooper O'Neill's testimony that they weren't able to tell whether Mr. Smith or Mr. Hamilton were there or not. Just so I understand what the poll camera evidence shows, I take it we can't tell anything about the identity of people who are picked up on the camera. Does the record show how many people were at all total going in? No, there's nothing in the record about that. Well, we know that there were two figures seen, but you're saying that we don't know whether there were more than two figures seen? That's right. It's just silent on that point? Just silent. The record is silent on that. So did the film go in or just those two images? Judge Thompson, just those two images went in. The film didn't go in and no questions were asked. In fact, this primarily came up during the cross-examination of Trooper O'Neill. And the government didn't rely on the poll camera in terms of linking Mr. Smith to 16 Harrow Street. So I would suggest to the extent the evidence is undeveloped, it was my friend's burden to clarify that record because it's his argument that the poll camera coverage undermines the other information that was known. I take that point, but in terms of figuring out if it undermines it, what does it undermine? So I guess we could say that the evidence that you've put forward about residence wouldn't necessarily be undermined because people can have a residence and not be at the house. The residence is not presence. But one might think that since you're relying solely on time of day for the reason to believe he would be present, it would be somewhat problematic if the record over 60 days of taking pictures of the house suggested that only two people had ever entered the house. That would seem to call into question why it would be reasonable to think that he would be there at 6 AM. Or am I wrong on that? No, I don't think you're wrong about that, Judge Barrett. And if the record showed that, then perhaps that argument could be made. But the record doesn't support that assertion in this case. And I would additionally add, it's not at all unusual for somebody to leave their residence if they're working early in the morning before it becomes light and return late at night after the sun has set. And it's unlikely that any kind of usable image of that individual would be effectively captured by the poll camera. So I don't think it's at all remarkable in this instance that they were not able to get any usable, as Trooper O'Neill testified. Was it light out when they went at 6 AM? Do we know? We don't know that. My experience is that it was February 16th. I don't think it would be, but I don't believe there was testimony as to that. If I could just make one final point in response to the question that my friend was asked about the fact that they were told he was not there, I think Maryland v. Buey makes clear that they can search with an arrest warrant anywhere in the house for that individual to be located. Thank you. Okay. Thank you. Thank you. Two points, one on the postal search and one on the poll camera. First of all, on the postal search, Mr. Quindlen is right, that there was a postal search that indicated he received mail there. But I think that is also consistent with the fact of, given his age and the temporariness of some residences for people in their late 20s, as the court said in Vervalde in the 11th Circuit case, that it's not unusual for people to use their parents' address as a permanent residence. I don't think that really allows us to glean much in terms of whether or not he was currently residing there. What if we put it together with the fact that he reported it as his residence? Or a Tommy Smith reported it? Well, when you say he reported it as his residence, we don't know when, other than the August 20th date. I thought you might be talking about the accident report. No, I'm just... So in terms of the arrest warrant, he clearly gave that address on August 20th when he was pulled over for failure to yield and the like. So he did give it then. But again, I don't know that that gets you to the fact that he's currently living there simply on a postal search, especially when you counter that with the fact Trooper O'Neill ran a utility search and the utilities were not in his name. And many cases rely on electric and water bills to show that it's a permanency of the residence of that person. As to the poll camera, there was reliance on the poll camera. And I think there's several points to be made here. One, I don't believe it was our burden in the District Court on this poll camera issue. The government's testimony from Trooper O'Neill was that he in fact relied on the poll camera to try to determine if the true subject of their interest, Mr. Hamilton, would be present at 16 Harrow Street. When he said... When asked why he thought Mr. Hamilton might be at 16 Harrow Street, he said, from the surveillance that we were doing with the GPS and the poll camera, that's Appendix 138. He reiterated that just on the next page at 139. I thought that Harrow Street, based on the surveillance, the poll cameras and the GPS, it clearly had some... You may. It clearly had some impact on the investigation. And I don't think two still photographs, which are pulled from that, are representative of what the overall quality of the footage. And there's just no indication that men were coming and going from that location. And therefore, no indication that Mr. Smith would be present. Thank you. Thank you both.